Filed 7/30/26

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MESROP KAZARIAN,<br><br>    Defendant and Appellant. | E085048<br><br>(Super.Ct.No. FVI23001104)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County. Michael A. Camber, Judge. Affirmed.

Richard Schwartzberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Donald W. Ostertag and Robin Urbanski, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Mesrop Kazarian appeals from the trial court's entry of judgment after a jury found him guilty of one count of felony evasion of a pursuing police officer. (Veh. Code, § 2800.2 subd. (a).) In bifurcated proceedings, the trial court found defendant had a prior strike conviction under the "Three Strikes" law (Pen. Code, §§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)) and that, of two alleged sentencing factors to depart from a midterm sentence (Pen. Code, § 1170, subd. (b)(2)), one was true (defendant served a prior prison or jail term) but the other was not (his prior convictions were not numerous or of increasing seriousness). The court at sentencing imposed the midterm sentence of two years, doubled to four years with the strike.

Defendant asserts instructional error fatally tainted his conviction. He argues the trial court had a sua sponte duty to tell the jury what constituted speeding or failure to stop at a stop sign or other driving violations within the meaning of Vehicle Code definitions because three such violations were necessary to establish felony evading. As we explain *post*, the instructional omissions were at most harmless beyond a reasonable doubt under the circumstances here. Briefly stated, nothing in the omitted legal definitions of the violations at issue—such as the limit line at which a vehicle must stop at a stop sign—was in dispute. Instead, the factual and evidentiary questions regarding whether defendant almost doubled the undisputed maximum speed limit of 55 miles per hour on a city street and whether he slowed down "[a]t all" at two stop signs—at the limit line or not—were fully and fairly litigated below. Consequently, any technical instructional error or definitional omissions were harmless, and we therefore affirm the judgment.

## BACKGROUND

On a late January evening in 2023, around 1:20 a.m., San Bernardino County Deputy Sheriff Gabriel Dominguez responded to a medical aid call at a gas station in Apple Valley, at the intersection of Kiowa Road and Bear Valley Road. A fire truck, paramedics, and at least one other emergency response vehicle were already at the scene attempting to contact an unresponsive man in the driver's seat of a vehicle parked at a gas pump. The man turned out to be defendant. Dominguez noticed the engine was running on the man's vehicle, a Ram 1500 work truck. Dominguez did not know how long the man had been there; Dominguez could see that the man was not responding to the emergency personnel yelling outside his window.

As Dominguez walked towards the truck, he saw the driver "woke up," then "fidget[ed]" in his vehicle for a few seconds, reaching towards the center console, and then he "put the truck into drive." Pulling forward, defendant almost hit the fire truck parked in front of him, but stopped and, when he put his vehicle in reverse, Dominguez warned other emergency personnel standing behind defendant to move so they wouldn't be hit. Defendant exited the gas station onto Kiowa Road, and Dominguez ran to his patrol vehicle to follow defendant, in case he was having a medical emergency or was under the influence.

Activating the police lights and sirens on his vehicle, Dominguez contacted dispatch to alert them he was pursuing defendant, who was "taking off." When Dominguez exited the gas station, he was about five car lengths behind defendant, which he estimated was less than 100 feet, perhaps closer to 75 feet. When Dominguez looked

3

at his speedometer, "we were reaching speeds over a hundred" miles per hour. Defendant did not slow down or pull over.

About two miles from the gas station, defendant approached an intersection controlled by a four-way stop sign. He was still traveling "over a hundred" miles per hour, with Dominguez still about five car lengths behind him. Defendant did not stop at the intersection; according to Dominguez, defendant did not slow down "[a]t all."

Dominguez testified that in failing to stop at the intersection, defendant violated "Vehicle Code 22450(a)," which he testified "requires drivers to stop at or before the limit line while approaching the stop sign." Defense counsel initially objected to "the witness being asked to draw legal conclusions," but withdrew the objection when the trial court inquired if the prosecutor was going to lay a foundation. At the court's request, the prosecutor laid a foundation by inquiring into Dominguez's education and training regarding Vehicle Code violations.

Resuming his testimony regarding the pursuit, Dominguez testified that the speed limit on Kiowa Road between the gas station and the stop sign that defendant "blew" through was 50 miles per hour. Dominguez added, without specifying the nature of the survey, that the particular section of Kiowa Road had been "surveyed at 50 miles per hour." Dominguez also testified that Kiowa Road, as "a two-lane undivided highway with one lane for northbound, one lane for southbound traffic," had a "maximum" speed limit of 55 miles per hour, "per . . . Vehicle Code 22439(b)." Asked about any other speed violations in defendant traveling "over a hundred miles an hour," Dominguez

4

testified that speed violated "Vehicle Code 22350," which he described as prohibiting "Unsafe speed."

About 100 feet past where defendant failed to stop at the stop sign, defendant approached some railroad tracks that crossed Kiowa Road, with Dominguez still in pursuit. Defendant "didn't slow down" for the tracks and, as a result, "caught [some] air" in crossing the tracks; Dominguez estimated that the tires on defendant's truck were "three, four feet" off the ground. Defendant's vehicle "fishtailed a little bit" as the tires "came down and contacted the asphalt." Defendant had been traveling at "[a]t least a hundred" miles per hour when he "us[ed] the railroad tracks as essentially a ramp," which Dominguez testified violated "Vehicle Code 23103(a)."

Next in the pursuit, about four miles away from the starting point at the gas station, still on Kiowa Road and with defendant still traveling at a hundred miles an hour with Dominguez in pursuit, the duo approached another intersection with a four-way stop sign. Defendant again did not stop, which Dominguez testified was another violation of Vehicle Code section 22450.

Dominguez fell back slightly to about seven to 10 car lengths behind defendant as defendant approached another intersection, where Kiowa Road continued with a dirt surface. Dominguez lost sight of the truck due to dust and discontinued the pursuit pursuant to department policy, but continued to travel along the road at a safe speed. Dominguez found the truck in someone's front yard near the end of the road where it made a hard right turn. The truck appeared to have knocked a fence down, and the vehicle's airbags had deployed. Dominguez did not immediately find defendant, who

5

was not at or near the truck, but after several minutes of searching, Dominguez located defendant "off in the desert," hiding in some bushes, and arrested him. An audio recording of the pursuit was played for the jury.

Defendant testified. He admitted he had been convicted of three offenses involving moral turpitude—two felonies dating to 2009 and 2012, and a misdemeanor in 2020. He testified that he had fallen asleep at the gas station after a long workday in North Hollywood until very late in the evening, before commuting home to Apple Valley. He denied having consumed any alcohol or drugs. He said he was startled and "spooked" to awake to someone pounding on his truck window. Once he realized the person was a fireman, he still felt the man was rude and refused a wellness check. He thought there was enough space to exit past the fire truck; he never saw a policeman; his only thought was to get away from the fireman.

Taking Kiowa Road towards his home, he saw no vehicles in front of him or behind him. He heard no sirens. He stopped at all stop signs. At some point he noticed red lights flashing and a siren, but assumed it was the fire truck. At a second stop sign, he saw more lights, but they were too far away to pull over. He still thought they were from a fire truck, never a police car. He denied going airborne over the railroad tracks.

Defendant testified that his truck crashed when he missed a right turn, striking a rock that ruptured his tire; he had been looking in his rear view mirror, waiting for the flashing lights to get closer for him to pull over. He heard a siren in the distance but thought someone saw the crash and called the police; he never thought he was being pursued.

Asked on cross-examination whether he had been speeding, defendant answered, "Maybe I was going over the speed limit but not over 100 miles." He testified that "I was going probably 70, 72, 75, maybe," or "[m]aybe 80." Defendant added, "I'm not saying exactly how fast I was going, but I wasn't going over 100 miles. That's a hundred percent—I'm sure." When the prosecutor asked, "But now you're saying you may have been speeding," defendant responded, "If I was going over the street limit [*sic*] . . . if I was going over that limit, yeah, basically I was speeding. I can't lie."

## DISCUSSION

Defendant contends the trial court erred by failing to instruct the jury on the Vehicle Code definitions of the driving violations that the sheriff's deputy mentioned in his testimony: failing to stop at a stop sign, speeding, violating the basic speed law, and reckless driving. We conclude there was no error in omitting definitions for these violations and, even assuming any error, it was harmless beyond a reasonable doubt.

We review claims of instructional error de novo. (*People v. Caparrotta* (2024) 103 Cal.App.5th 874, 902.) " 'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' " (*People v. Smith* (2013) 57 Cal.4th 232, 239.) " 'That obligation includes instructions on all of the elements of a charged offense.' " (*People v. Rubalcava* (2000) 23 Cal.4th 322, 334.)

7

Failure to instruct on all of the elements of an offense is subject to harmless error review "so long as the error does not vitiate all of the jury's findings." (*People v. Merritt* (2017) 2 Cal.5th 819, 829; see, e.g., *Sullivan v. Louisiana* (1993) 508 U.S. 275, 281 [defective reasonable doubt instruction not subject to harmless error review because it "vitiates all the jury's findings"].) "Omitted element error is generally subject to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18." (*People v. Oyler* (2025) 17 Cal.5th 756, 838.) "Under this analysis, '[w]e must determine whether it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error' in omitting a necessary element of the offense." (*Ibid*.)

The felony evading statute is distinct from its misdemeanor counterpart by requiring as an additional element that the defendant, in attempting to elude a pursuing peace officer, must have driven in "willful or wanton disregard" for the safety of others. (Compare Veh. Code, §§ 2800.2 [felony offense] with 2800.1 [misdemeanor].[1]) In relevant part, the felony statute defines the requisite "willful or wanton disregard for the safety of persons or property" as: "driving while fleeing or attempting to elude a pursuing peace officer during which time either three or more violations that are assigned a traffic violation point count under [s]ection 12810 occur, or damage to property occurs." (§ 2800.2, subd. (b); see, e.g., § 12810, subd. (c) [reckless driving carries a traffic violation "value of two points"].)

---

[1] All further undesignated statutory references are to the Vehicle Code.

Here, the prosecution relied on the "three or more [point] violations" manner of committing felony evading, rather than the statute's property damage prong. As defendant points out, however, while the deputy identified in his testimony the violations he believed defendant committed during the pursuit (e.g., failing to stop at a stop sign, speeding, etc.), and the trial court in its instructions identified driving record demerit values (one point each) for speeding and stop sign violations, the court's instructions did not define for the jury what constituted a speeding or stop sign violation, nor any other driving violations. Defendant argues the instructions were therefore faulty because they did not allow the jury to determine for itself whether he committed any driving violations during the pursuit, an essential element of felony evading.

Defendant's argument has some appeal. The court instructed the jury using CALCRIM No. 2181 ("Evading [a] Peace Officer"), which provides a pattern instruction for both felony evasion of a pursuing police officer (§ 2800.2) and the lesser offense of misdemeanor evading (§ 2800.1, subd. (a)). The court instructed the jury on both the felony and misdemeanor versions of the offense, the only difference being that, as noted, willful and wanton driving is not an element of the misdemeanor offense, and hence no traffic violations need be proven.

The trial court's felony evading instruction stated the following as a required element of the offense, including proof of traffic violations: "3. During the pursuit, the defendant committed three or more violations, each of which would make the defendant eligible for a traffic violation point." The court's instruction specified, as suggested by bracketed language in the pattern instruction, that "Speeding and failing to stop at a stop

9

sign are each assigned a traffic violation point." (See CALCRIM No. 2181 [providing bracketed language to insert as relevant: "*<insert traffic violations alleged>* are each assigned a traffic violation point"].) Consistent with CALCRIM No. 2181, the court's instruction to the jury also defined some terms used elsewhere in the full instruction, such as "*willfully*," "*distinctively marked*," and "*distinctive uniform*." But CALCRIM No. 2181 does not suggest defining—and the trial court did not define—the speeding or stop sign violations the court named as carrying a point, nor did the court otherwise define any other driving violations.[2]

Failure to define for the jury Vehicle Code violations that are essential elements for commission of an offense may constitute reversible error. In *People v. Minor* (1994) 28 Cal.App.4th 431 (*Minor*), the appellate court considered instructions given regarding the felony offense of drunk driving causing injury defined in section 23153, subdivisions (a) [while driving under the influence (DUI)] and (b) [while driving with a blood-alcohol concentration (BAC) of .08 percent or more]. As was well-established, the second

---

[2] In full, the trial court instructed the jury on the elements of felony evading as follows, with our italics highlighting the third element: "The defendant is charged in Count 1 with evading a peace officer in violation of Vehicle Code section 2800.2. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. A peace officer driving a motor vehicle was pursuing the defendant; [¶] 2. The defendant, who was also driving a motor vehicle, willfully fled from, or tried to elude, the officer, intending to evade the officer; [¶] *3. During the pursuit, the defendant committed three or more violations, each of which would make the defendant eligible for a traffic violation point*; [¶] AND [¶] 4. All of the following were true: [¶] (a) There was at least one lighted red lamp visible from the front of the peace officer's vehicle; [¶] (b) The defendant either saw or reasonably should have seen the lamp; [¶] (c) The peace officer's vehicle was sounding a siren as reasonably necessary; [¶] (d) The peace officer's vehicle was distinctively marked; [¶] AND [¶] (e) The peace officer was wearing a distinctive uniform."

element of the offense required proof of "an unlawful act or neglect of duty *in addition to*" driving while intoxicated. (*Id.* at p. 438.) The prosecution had tried the case on the theory that the additional unlawful act was an illegal lane change (§ 21658) or speeding in violation of the maximum speed law (§ 22349) or the basic speed law (§ 22350), but no instructions defining those violations were given in conjunction with those on the drunk driving with injury charges. (*Minor*, at pp. 437-438.)

Finding the instructions prejudicially incomplete, the *Minor* court reversed. The court explained: "Because the trial court did not reference the applicable Vehicle Code violations with respect to Minor's felony drunk driving counts, the jury very well may have concluded it did not have to find any Vehicle Code violation to convict him on these counts." (*Minor*, *supra*, 28 Cal.App.4th at p. 438.)

*Minor* is distinguishable here in the sense that the trial court did not fail altogether to mention the underlying Vehicle Code violations with respect to the felony evading offense. The court specified that failing to stop at a stop sign and speeding each incur a traffic violation point, thereby informing the jury that each instance of those violations qualified to constitute one of the three or more violations necessary for felony evading.[3] (See CALCRIM No. 2181.) This bare mention of the stop sign and speeding violations, however, did nothing to define them.

---

[3] We presume jurors "to be intelligent people, capable of understanding and correlating all instructions." (*People v. Ayers* (2005) 125 Cal.App.4th 988, 997.) Because the jurors were not told that reckless driving carries a traffic violation point or points, we presume the jury did not rely on reckless driving as a driving violation in finding defendant committed felony evading. We therefore discuss only the alleged stop sign and speeding violations in the remainder of the opinion.

Nevertheless, reversal is not required. Absent the definitions, it may seem that the jury could not determine defendant violated the particular Vehicle Code provisions. But when a trial court does not fully instruct a jury on every element of a charged offense, the " 'critical inquiry' " is *not* the mere fact of omitted elements or " 'the number of omitted elements *but the nature of the issues removed from the jury's consideration*,' " if any. (*People v. Merritt*, *supra*, 2 Cal.5th at p. 828, italics added.) Here, nothing meaningful was omitted from the jury's consideration.

The stop sign violations illustrate the point. The Vehicle Code provision regarding "Stop requirements" at a stop sign states in relevant part: "The driver of any vehicle approaching a stop sign at the entrance to, or within, an intersection shall stop at a limit line, if marked, otherwise before entering the crosswalk on the near side of the intersection. [¶] If there is no limit line or crosswalk, the driver shall stop at the entrance to the intersecting roadway." (§ 22450, subd. (a).)

This language specifies both that a driver must stop when a stop sign marks an intersection and that he or she must do so at one of several spots, as applicable, but the fine point of where to stop was not at issue here. Rather, the question the parties litigated was whether defendant stopped at all: defendant testified he did, the deputy testified he did not. Nothing was lost in the omission of the technical Vehicle Code definition of a stop sign violation because, absent the detail of *where* to stop, which was superfluous on the facts here, the *stopping* part of the driving rule did not have " 'a technical meaning that is peculiar to the law.' " (*People v. Krebs* (2019) 8 Cal.5th 265, 331-332.)

12

" '[W]hen a word or phrase " 'is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request.' " ' " (*People v. Krebs*, *supra*, 8 Cal.5th at pp. 331-332.) That was the case here. The trial court's felony evading instruction effectively told the jury, in stating that a stop sign violation qualified for a point, to resolve the factual dispute between the parties over whether defendant stopped his vehicle at any stop signs that were present along the pursuit route, as a prerequisite to determining whether to convict defendant of the felony evading offense. (See generally *Ayers*, *supra*, 125 Cal.App.4th at p. 997 [jurors presumed "[s]ensible" to correlate all the different parts of the court's instructions].)

Nothing more was required to tell the jury what the "stop" part of a stop sign violation means. "Stop" has a common, everyday meaning to bring movement to a halt, which jurors would naturally understand. Full instruction in the Vehicle Code statutory definition was unnecessary because the technical question of where precisely to stop was not at issue. Instead, the question was simply whether defendant stopped at all at either of the two stop signs he did not dispute were present on the pursuit route. Consequently, we conclude there was no instructional error precluding the jury from finding that two stop sign violations occurred; the court's evading instruction that failure to stop at a stop sign incurs a point violation was enough.

The court's evading instruction similarly told the jury to determine whether defendant committed a speeding violation by alerting the jury that such a violation also incurs a point and therefore would qualify as one of three violations necessary for felony evasion. Any error by the court in failing to tell the jury what the criteria were on which to determine whether there was a speeding violation was harmless on the facts here. *People v. Ellis* (1999) 69 Cal.App.4th 1334 (*Ellis*), relied upon by defendant, actually shows why there was no error here or that any error was harmless.

*Ellis*, like *Minor*, involved a drunk driving with injury charge (§ 23153, subd. (a)) and specifically whether an instruction defining speeding within the meaning of the basic speed law (§ 22350) was necessary. In *Ellis*, the reviewing court observed that "[i]t is commonly understood that speeding, in the context of driving a motor vehicle, means driving a motor vehicle faster than is allowed by law. We believe the most common understanding people have of speeding is driving faster than the posted speed limit." (*Ellis*, *supra*, 69 Cal.App.4th at pp. 1338-1339, fn. omitted.) The *Ellis* court found that the defendant "was not convicted on a theory that he was driving faster than the maximum posted speed limit, since there was no evidence of the posted speed limit nor was there any meaningful evidence of defendant's exact speed at the time of the accident." (*Id.* at p. 1339.) As a result, the defendant's conviction necessarily "was based on a violation of the basic speed law," which was defined then in section 22350, as it is now. (*Ellis*, at p. 1339.)

14

The *Ellis* court explained that failure to instruct the jury with the basic speed law as codified in section 22350 was error because its definition of speeding—driving "at a speed greater than is reasonable or prudent" based on road and weather conditions, or "at a speed which endangers . . . persons or property"—included factors a jury would not necessarily know to weigh to determine if a speeding violation occurred. (*Ellis*, *supra*, 69 Cal.App.4th at p. 1339.) The court noted in particular "that to serve on a jury one need not be a licensed driver, and therefore all jurors are not necessarily aware of the 'rules of the road,' " learned by experience. (*Ibid.*)

Unlike in *Ellis*, the prosecution here put on undisputed evidence of the maximum speed limit along the pursuit route and did not just rely on an undefined unsafe speed limit rule. The deputy testified that a "survey" method, apparently conducted under the Vehicle Code, established a maximum speed limit of 50 miles per hour for Kiowa Road and that, in any event, the absolute maximum speed limit under section 22349 for that type of two-lane, undivided road was 55 miles per hour. The fact that the court did not sua sponte reproduce for the jury the terms of section 22349 to corroborate the survey and road category maximum speed limits referenced by the deputy was not error. The speed limit on Kiowa Road was an evidentiary matter; it was not a legal one requiring an instruction as a matter of law. Instead, defendant was free to put on contrary evidence that the speed limit was posted at a higher maximum rate, or was not posted at all, or other evidence indicating the applicable upper speed limit, but he did not do so. The officer's testimony and credibility regarding the evidentiary question of what speed limit applied on the pursuit path was for the jury to evaluate.

15

In any event, no critical elements of the maximum speed law were lost by the trial court not instructing the jury with the terms of section 22349, which we set out in the margin.[4]  Absent the instruction, the jury still had what it needed to determine whether defendant exceeded the maximum speed limit.  It had the deputy's undisputed testimony as to what the speed limit was, the deputy's testimony that defendant exceeded that limit by speeding at more than 100 miles per hour, and it also had defendant's general denial of the speeding allegation inherent in his not guilty plea to the evading charge, along with defendant's denial that he sped at 100 miles an hour or more.  No more was required, at least regarding the maximum speed law.

As to the "unsafe speed" law that Deputy Dominguez also referenced,  we conclude like the court in *Ellis* that failing to provide the basic speed law's terms to the jury was error.[5]  The jury could infer that the point violation specified by the court for "[s]peeding" applied equally to violations of the maximum speed law and the basic speed law, but without having been guided to consider the weather and road conditions

---

[4]  Section 22349, titled "Maximum speed limit," states in relevant part: "(b) Notwithstanding any other provision of law, no person may drive a vehicle upon a two-lane, undivided highway at a speed greater than 55 miles per hour unless that highway, or portion thereof, has been posted for a higher speed by the Department of Transportation or appropriate local agency upon the basis of an engineering and traffic survey.  For purposes of this subdivision, the following apply:  [¶]  (1) A two-lane, undivided highway is a highway with not more than one through lane of travel in each direction.  [¶]  (2) Passing lanes may not be considered when determining the number of through lanes."

[5]  Section 22350, entitled "Basic speed law," provides:  "No person shall drive a vehicle upon a highway at a speed greater than is reasonable or prudent having due regard for weather, visibility, the traffic on, and the surface and width of, the highway, and in no event at a speed which endangers the safety of persons or property."

16

specified in the latter, or whether the defendant's rate of speed was "reasonable or prudent" and did or did not "endanger" others, the jury would not know that these were the criteria to avoid violating the basic speed law. Omitting the terms of the basic speed law from the instructions was error.

The disposition in *Ellis* reflects that the court concluded in the unpublished portion of the opinion that the omission there, while error, was harmless. (*Ellis*, *supra*, 69 Cal.App.4th at p. 1340.) We reach the same conclusion here.

Simply put, it is clear beyond a reasonable doubt that had the omitted instructional terms been included, the jury nevertheless would have rendered the same verdict. (*Oyler*, *supra*, 17 Cal.5th at p. 838.) In particular, while defendant denied speeding at 100 miles per hour, he admitted he was "going probably" between 70 and 80 miles per hour, which was well in excess of the maximum speed limit, whether it was 50 miles per hour or 55 miles per hour under the maximum speed law. (§ 22349, subd. (b).) The maximum speed law provides that it applies to limit undivided highway speeds to 55 miles per hour "[n]otwithstanding any other provision of law," absent a higher posted speed based on an engineering and traffic survey. (*Ibid.*) Instructing the jury with the basic speed law therefore would not have made a difference to prevent the jury from finding a speeding violation. At bottom, we see no possibility of a different verdict had the jury been instructed with the terms of sections 22349, 22350, or 22450.

## DISPOSITION

The judgment is affirmed.

CERTIFIED FOR PUBLICATION

MILLER _____
J.

We concur:

RAMIREZ _____
P. J.

CODRINGTON _____
J.